USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10-21-2010_

RECEIVED
UNITED STATES DISTRICT COURT OFFICE
SOUTHERN DISTRICT OF NEW YORK
2010 OCT 22  P 4: 28

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

PETER W. LINDNER,

                Plaintiff,

    -against-

AMERICAN EXPRESS CORPORATION
                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

Honorable Magistrate Judge Cott

10 Civ. 2228 (JSR-JLC)

<u>REQUEST FOR ESI FROM
ADVERSARY</u>

## Contents

Request ........................................................................................................................... 2
Summary ........................................................................................................................ 8
Appendix 1:  Joe Sacca formally announces Amex will not give ESI ........................................ 10
Appendix 2:  Dates Plaintiff contacted Joe Sacca to set up ESI Conference ............................ 11
Appendix 3: Emails to/from Joe Sacca by Plaintiff ............................................................... 12
    Appendix #3a: ............................................................................................................ 12
    Appendix #3b: ............................................................................................................ 13
    Appendix #3c: ............................................................................................................ 14
    Appendix #3d: ............................................................................................................ 15
Appendix 4:  8 page letter to Joe Sacca proposing ESI's scope .............................................. 16
    Attachment 1: Case Blurb: Aguilar; Metadata Production Requests Should be Made Early... 20
    Attachment 2:  The beginning of FRCP 26: ..................................................................... 22
    Attachment 3:  Letter of Joe Sacca to Peter Lindner on Wednesday, October 13, 2010 4:57 PM
    .................................................................................................................................. 23
Appendix 5: SDNY rules / guidelines for EEOC related suits .................................................. 25
Appendix 6: Joe Sacca and Jean Park's comments on Amex not stopping Lindner from
communicating with SEC ................................................................................................... 27
    Appendix 6A:  Joe Sacca says Lindner claims MJ Katz enjoined Lindner from contacting SEC
    .................................................................................................................................. 27
    Appendix 6B:  Jason Brown in April 2007 reads into the Court Transcript enjoining Lindner
    from contacting SEC ..................................................................................................... 27
    Appendix 6C: Excerpt from April14 2009 Transcript in front of SDNY USDJ Koeltl ........... 29
    Appendix 6D : Excerpt from Transcript in front of SDNY USDJ Koeltl ............................... 30



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X    Honorable Magistrate Judge Cott

PETER W. LINDNER,

                Plaintiff,

            -against-                    10 Civ. 2228 (JSR-JLC)

                                   <u>REQUEST FOR ESI FROM</u>

AMERICAN EXPRESS CORPORATION        <u>ADVERSARY</u>

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

*First 9 pages* Via Fax: (212) 805-7990

# Request

Thursday, October 21, 2010

To the Honorable Magistrate Judge Cott,

       As per Your Honor's ORDER of August 18, 2010 (Pacer #5) said that I should try to meet (in person or by telephone) with Amex before requesting ESI.   I hereby request that Amex start turning over discovery material weekly via DVD as I outlined to Mr. Sacca

       Moreover, Mr. Sacca refused to meet as per Your Honor's rules of Individual Practice[1] on discovery motions.

       I wish to raise these several points in this brief:

---

[1] "Individual Practices of Magistrate Judge James L. Cott" April 6, 2010:

> "[II, A] 1. Discovery Motions. No motion relating to discovery (that is, any dispute arising under Rules 26 through 37 or Rule 45 of the Federal Rules of Civil Procedure) shall be heard **unless the moving party has first conferred in good faith by telephone or in person** with all other relevant parties in an effort to resolve the dispute. Counsel must respond promptly (normally, within one business day) to any request from another party to confer in accordance with this paragraph." (**emphasis** added)

I wrote Mr. Sacca on Wednesday, October 13, 2010 7:40 PM, and we only talked about it on Wed, Oct 14 at 7pm, and then begrudgingly, and by saying his letter of Oct 15, 2010 was the conference – which I pointed out was not meeting in person or by telephone. In fact I wrote Mr. Sacca on Wednesday, October 13, 2010 9:03 PM (see **Appendix 4: 8 page letter to Joe Sacca proposing ESI's scope**) what I wished to discuss.  I also asked Mr. Sacca on Wednesday, October 20, 2010 10:22 AM.  I note that this breaks Your Honor's rules "Counsel must respond promptly (normally, within one business day) to any request from another party to confer in accordance with this paragraph"

1. Co-Counsels Joe Sacca & Jean Park did have "intent to deceive" the Court in April 2009 before USDJ Koeltl by asserting Amex did not attempt to stop me from communicating with the SEC, which Amex did in April 2007.  Ms. Park was in the April 2007 meeting.

2. Amex denied that Vice President Qing Lin (VP) did in Mar/Apr 2005 breach the Amex-Lindner Contract of June 2000 for a period of several years.

3. That Qing admitted in January 2009 under oath that he violated the two parts of ¶13, specifically that Qing gave "any information" to a prospective employer of mine and that Qing did not refer them to Human Resources.

4. That in April 2009 CEO Ken Chenault did tell[2] the assembled Amex Shareholders that he has faith in the integrity of his employees (Qing, Banking President Ash Gupta, Secretary of the Corporation Stephen Norman).

5. That the Amex Code of Conduct would have had Qing, Ash, Jason Brown all report to their managers and to the Secretary of the Corporation Qing's questionable ethics past, present or future, which apparently was not done for several years, instead of being done prospectively in March 2005 by Qing.

6. That Qing left or was fired two weeks after the April 2009 Shareholders' Meeting.  The fate of Mr. Jason Brown who in April 2006 covered up Qing's Feb 2006 admission of breach of contract is not known.  Nor is it known if that cover-up memo sent to me via email was given orally, in writing via email or any other way to Mr. Norman.  Mr. Brown's notes were in handwriting.[3]

---

[2] I spoke for about 2 pages, detailing Qing's wrongful actions which the Amex Code of Conduct would have cleared up in a day, but is going on for over 5 years.

I had said in part:

> "Well Mr. Ken Chenault Esquire -- you know that the Amex code of conduct is not working. So does Ash Gupta, the president of banking at Amex. In 1998 and in 2005 and still in 2009, Amex violated its code of conduct that applies to all employees, including Mr. Gupta and you, Mr. Chenault. "

Mr. Chenault replied in full:

> **"Kenneth I. Chenault** - *American Express Company - Chairman and CEO*
>
> Thank you, Mr. Lindner. Let me say I have full confidence in the Company's code of conduct and the integrity and values of our employees, for Steve who handled this from an administrative channel. "

Source: Excerpt from April 2009 Amex Shareholder Meeting.doc
[AXP - American Express Company Shareholders Meeting, Event Date/Time: Apr. 27. 2009 / 10:00AM ET, © Thomson StreetEvents[sm]]

[3] Exhibit DEF00370, which means Defendants' Exhibit #370, is a handwritten note by Mr. Brown which records the investigation taken by Mr. Brown at the request of Secretary of the Corporation Stephen Norman as to whether Qing

7. That in April 2010, CEO Chenault did not retract nor modify his misleading statements defending Qing, Ash, Mr. Norman and others who had violated the Amex Code on many levels over several years.

8. To date, the personnel files, email records, backup files and hand-written notes have not been categorized as to their existence and as to Attorney Client privilege, which has been asserted by Amex without a detailed list.[4]

9. Since Qing has "left" Amex, Amex has not produced his personnel file, nor the contents of his PC so as to check for evidence of tampering (Qing was a computer expert along with me in 1998, when Qing was my manager, and Ash Gupta was Qing's manager)

10. Amex has not produced its Custodian of Documents to ensure which documents were preserved and which were tampered with; in fact, Amex's Jean Park refused to name the Custodian.

Given these circumstances, *Feb 2006 - Apr 2006 (PWI)* and the stakes involved, and that Jason Brown, Esq. did cover up Qing's breach in ~~Feb2007~~ ~~Apr2007~~ and that Qing left Amex under a cloud, it is quite likely that evidence was not preserved, and may even be tampered with as we speak.

Amex has refused to produce any discovery, and refused to produce ESI. Amex's Joe Sacca refused to meet on the grounds that his motion of today (last night Wed, Oct 20, 2010) precludes discovery under 15 U.S.C. § 78u-4(b)(3)(B), which was passed under the Republican Contract with America over President Clinton's veto. However, that law makes an exception where data may not be preserved:

**"(B) Stay of discovery**
In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the

---

Lin violated paragraph 13 of the June 2000 Amex-Lindner contract, which says Qing can not give "any information" to a prospective employer (in this case, a small NYC consulting firm named FischerJordan). It is from Feb2006.

[4] Specifically, Amex has not produced a list, nor has Amex identified the reasons for the documents being confidential, as per FRCP 26 (b)(5) "Rule 26. Duty to Disclose; General Provisions Governing Discovery, (b) Discovery Scope and Limits."

"(5) Claiming Privilege or Protecting Trial- Preparation Materials.

(A) Information Withheld. When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:

(i) expressly make the claim; and

(ii) describe the nature of the documents, communications, or tangible things not produced or disclosed — and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim. "

motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party. "

I assert that is the case now, and was in 2009, which I brought to Mr. Sacca's attention **last night** when he asserted that Amex did not interfere with me communicating to the SEC. I sent Mr. Sacca a copy of the "Still CONFIDENTIAL TRANSCRIPT OF SETTLEMENT CONFERENCE LindnervAmEx032907.pdf" which shows that Amex's VP Jason Brown, Esq. did in fact [5] stop me (Plaintiff Lindner) from filing with the SEC. I hope Mr. Sacca reads that and recants, so that Your Honor can certify that Amex did have "intent to deceive" the Court in April 2009 when Joe Sacca (whose co-counsel was at the Mar 29, 2007 Settlement Conference) told USDJ Koeltl

> "There
> 15 is in fact no evidence in the record that Mr. Lindner was under
> 16 any prohibition from responding to the SEC"[6]

 I also assert that I am trying to compel Amex CEO Ken Chenault to be deposed if he misled shareholders in April 2009 and April 2010, and Ms. Jean Park, Esq. of Kelley Drye who represented Amex along with Joe Sacca of Skadden in April 2009, to see if she had an intent to deceive[7] the Court by denying that Amex had stopped me from communicating with the SEC (which Amex did via Court ORDER and via threat of Contempt of Court) in April 2007.

   I have done repeatedly[8] over the past several weeks as Your Honor ORDERed, and Mr. Sacca has refused, with today being official in office stationary.  Two months ago I wrote:

> "I also ask that Amex be compelled to produce all documents in
> searchable format, in accordance to the FRCP 26 standard of December 2006, and
> of the standards for the US Court of Appeals for the Second Circuit.  I believe
> Amex has purposely not given me documents as ESI (electronically stored
> information) that is searchable in order to hinder my quest for justice, as I see it."

   I note that Mr. Sacca's letter of October 15, 2010 is not searchable, as is required by the Second Circuit Court of Appeal's rules on ESI, and is not what I requested, and is not what is meant by "native" format with metadata.[9]  For instance, the word "dismiss" can not be found via

---

[5] (see Appendix 6B: Jason Brown in April 2007 reads into the Court Transcript enjoining Lindner from contacting SEC )
[6] This quote is from **Appendix 6D : Excerpt from Transcript in front of SDNY USDJ Koeltl**, but is illustrative in that it happened 3 times: twice verbally and once in print.

[7] This provision of NY State law applies to SDNY, and its harsh consequences should not be a reason to allow the attorneys to violate it with impunity.

[8] Please see Appendix 1, 2, 3 and 4 for various proof of this assertion of my efforts.

[9] Mr. Sacca nicely agreed last night to provide all documents in searchable format, if it were possible, being that he is not a technical man.  However, I wrote to Mr. Sacca in my letter to him of Thursday, October 21, 2010 6:54 AM that his 390 page document is searchable in part, but not in whole.  Hopefully Mr. Sacca will correct that without Your Honor's intervention.  I appreciate that this is a good-will start on the part of Mr. Sacca of Skadden, and hope

the search function in Adobe, nor with Microsoft Word.  This also flies in the face of NY State law on allowing ESI where it may reasonably be expected in discovery.  I note that in the past two years in this shareholder case, Defendant Amex has filed hundreds (I count 390 pages alone in the submission of March 23, 2010) or perhaps filed thousands of pages, perhaps none of which were in ESI format, but rather in paper, when in fact Amex and Skadden and KellyDrye all have this information in ESI format with metadata.  I ask for sanctions upon Skadden and Amex now, with increasing sanctions for subsequent violations of such regulations on computers, which are essential for this case. FRCP has been in effect since promulgated by the US Supreme Court in December 2006 and approved (I believe) by the US Congress.  I think that 4 years is long enough for Amex and Skadden to adhere to the law without being reminded by their adversary (me) or by Your Honor.

   I also hereby ask for a discovery schedule that would give me documents relating to my Shareholder Proposal on revising the Amex Code of Conduct ("Code"), and CEO Ken Chenault's notes, recordings, emails on this subject, as well as the parties involved (Qing Lin, Ash Gupta, Jason Brown, Secretary of the Corporation Stephen Norman, and their bosses) whom should have reported the admitted breach of the contract and the violation of Title VII of the Civil Rights Act of 1964.  February 2006 Amex VP Jason Brown, Esq. wrote in his notes that Qing said to Fischer Jordan (my potential employer) that "I don't think Peter Lindner can work at American Express." So, on that day, Mr. Brown was supposed to under the Amex Code report that to his manager, and then the manager would report that to the Secretary of the Corporation. Instead, Mr. Brown wrote me a letter denying that is what was said, in reply to my "memorialization" of that revealed information.  And that would include emails between Qing and his managers and lawyers relating to this issue.  The other issue is whether Amex is enforcing the Code, which it filed with the SEC, and which could have exempted Qing, Ash, CEO Chenault, Jason from the Code.  So, Amex knowingly filed a false document with the SEC, which could have been revised, and which would have helped handle these very situations where a cover up is kept from March2005 through the present month of October 2010, which is 5 ½ years.

   I read an article[10] that says that although legal holds on discovery were lax in 2006, they are more strongly enforced in 2009.  Amex should obey the current standards, and commence discovery now.

---

that this will continue to all documents, especially since I am a pro se litigant, and digesting 300 pages is difficult for a single file, let alone the 3,000 files in my Amex folder. (2,381 in my laptop alone, not counting paper files).
[10] The article says the laws / rules passed in 2006 were laxly enforced, but now Courts are taking them seriously:

   "Given the newly emerging world of e-discovery courts often asked for better legal hold procedures, but were not cracking the whip yet.  Fast foward to today - post 2006 FRCP e-discovery amendments.  The trend is far from tolerance for a lax legal hold business process.  See Acorn v. Co. of Nassau, 2009 WL 605859, (EDNY 3/9/09) ("the failure to implement a litigation hold at the outset of litigation amounts to gross negligence.") (Awarded sanction of motion costs and attorneys fees for failing to implement a litigation hold).  As detailed in the posts to EDD Update, the judiciary's patience with lawyers and litigants is waning. More and more some formal legal hold business process is required.

   In the Legal Hold 2.0 world litigants and the courts are testing the effectiveness of a company's legal hold business process. "
   ["Legal Hold 2.0", August 05, 2009, John Jablonski at 10:47 PM in Cases: Verdicts, Settlements, Rulings]

Qing, who is computer literate, remained at his computer for 3 ½ years to cover up his crime from his computer and possibly from back up tapes. I also request an inventory of all documents by the custodian of Amex's documents, and a listing of all possible documents that may be covered by attorney-client privilege with the appropriate information to discover whether that assertion is valid or not. Jason Brown had his information on a piece of paper, hand-written in Feb2006. We need to get all paper documentation if that was a ruse to escape detection by ESI, and a computerized listing of Amex's data and metadata. Metadata is the part of an email message (for instance) that verifies the sender, receiver, timestamp, and helps confirm if the data was faked or was authentic. I request the personnel files of all involved, without redaction, since Qing has already admitted to breaching the June 2000 contract, which Amex denied repeatedly in private phone calls in July/August 2005 through public comments by CEO Chenault in April 2010. I note that EEOC cases are required to turn over personnel files as per the SDNY rules, entitled "Plaintiff's Interrogatories & Request for Production of Documents - Employment Discrimination Cases" [Please see Appendix 5 for the SDNY rules on EEOC disclosures.]
Plaintiff's Interrogatories & Request for Production of Documents - Employment Discrimination Cases

I note that the SDNY includes ESI and termination letters within the personnel files. I consider this suit not just a (my) Shareholder Proposal, but also a request for testimony by possibly perjured Amex Executives, including violations of Title VII of the Civil Rights Act of 1964, and the June 2000 Contract, and of SEC rules on misleading information to Shareholders. Amex wrote the SEC that my Shareholder proposal was a matter of management prerogative (so called "ordinary business"), when it was clearly intended to be a matter of significant social policy, ie. Discrimination against gays and sexual harassment in the workplace and its remedy, and whether the SEC will act against misleading statements to shareholders by the CEO, and false statements filed with the SEC (under Sarbanes Oxley, which mandates the rules for Amex's Code of Conduct).

I note that to communicate with Amex's hundreds of thousands of shareholders and employees, I need to be able to show that Qing did indeed admit violating the Amex Code of Conduct and the Amex-Lindner June2000 contract in particular, which Qing did on video. Magistrate Judge Katz minimized my use of the video – and upon Amex's application – took the videos which I paid for from me and put them under seal, explaining[11]

> Mr. Lindner has made clear that he has no legitimate interest in videotaping these depositions. In his January 6th "Appeal of Oral Order of Magistrate Judge on Videotaping." Mr. Lindner stated his intent to:
>
> > "disseminate [the videotapes] without prior permission of Amex or of the Court, via any/all/no media, including the internet, you-tube (youtube.com), television, newspapers, subject to [his] control."

I assert now that an SEC violation and "intent to deceive" the Court are good enough legitimate reasons to show that Qing did breach the contract in Mar/Apr2005, Amex VP Jason Brown, Esq. knew that for a fact in Feb2006, that neither followed Amex's Code (the subject of my

---

http://www.eddupdate.com/2009/08/legal-hold-20.html#more

[11] It is on Pacer #120 in 06cv3834 "Document 120 Filed Jan 14 2009 on video of deposition has no other legitimate use.txt"

shareholder proposal to update and enforce the Code) in April 2005, Feb2006, April 2006, or Jan 2009, and that as a consequence, CEO Chenault misled shareholders in April 2009 and in April 2010, with the connivance of Amex's lawyers by intent to deceive the Court in April 2009 in denying that Amex did in fact stop me (Plaintiff Lindner) from communicating with the SEC.

## Summary

I thus request an ORDER from Your Honor that Amex should begin delivering within 7 days all ESI to me on a DVD, so that those above mentioned people (and their aides) should turn over their emails and notes and text messages (etc), so that every week, additional documents are released, with a penalty of a substantial sum and possible Contempt of Court for the Amex Executives if they balk at obeying FRCP 26 and 16, and SDNY, NY State and NYC ESI regulations on producing in searchable, native format. Amex should assert[12] to MJ Katz to release Plaintiff Lindner's video tapes of Qing and of Jason Brown's admissions of Jan2009 so that they can be shown to Amex Shareholders and to Your Honor's Court as relevant contradictions to CEO Chenault's public (misleading) statements to shareholders in April 2009 and April 2010.

Additionally, Joe Sacca should be required to state on the record whether or not he now knows that Amex in April 2007 prohibited me from contacting the SEC, as per Magistrate Judge Katz's ORDERs, and that this oral "document" was read into the Court's record by Amex VP Jason Brown, Esq., and that his co-counsel Jean Park and Amex's Counsel did help to write that "document" and/or read it into the record. If as I assert that Mr. Sacca and/or Ms. Park did "intend to deceive" the Court in violation of NY Judiciary §487, I need that certified by Your Honor in order to get treble damages; I hereby ask that a ruling be made on this issue by Your Honor, so that we can move on with the truth. I note that sometimes some rulings aren't made, and a higher Court will kick that back down, and ask the District Court to rule on an issue; please Your Honor, let's have it clear that I should not be defeated by the illegal acts of Officers of the Court, as I was in April2009 and April2010.

If Your Honor rules against me, I hereby request oral argument as per Your Honor's Individual Practices:

"F. Oral Argument. Parties may request oral argument by letter at the time their moving or opposing or reply papers are filed. The Court will determine whether argument will be heard and, if so, will advise counsel of the argument date."
[Individual Practices of Magistrate Judge James L. Cott, JLC Rev. as of 4/6/10]

Dated: New York, NY
Thursday, October 21, 2010

---

[12] I previously requested this of MJ Katz in Tuesday, May 19, 2009, entitled "Motion Where Plaintiff Seeks Permission To Unseal Documents And Get Testimony Prior To And Post Mediation"

By: _____   10/21/2010   9:58am

      Peter W. Lindner
      Plaintiff, *Pro Se*
1 Irving Place, Apt. G-23-C
New York, New York 10003

Home/ Fax:    212-979-9647
Cell:         917-207-4962
Email:        nyc10003@nyc.rr.com

# Appendix 1:  Joe Sacca formally announces Amex will not give ESI

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

TEL. (212) 735-3000
FAX. (212) 735-2000
www.skadden.com

DIRECT DIAL
(212) 735-2358
DIRECT FAX
(917) 777-2358
EMAIL ADDRESS
JOSEPH.SACCA@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

October 15, 2010

**BY EMAIL**

Peter W. Lindner
1 Irving Place, #G-23-C
New York, NY 10003

Re:    *Lindner v. American Express Company*,
         10-cv-2228 (SDNY)

Dear Mr. Lindner:

I write in response to your letter of October 13, 2010. All defendants who have been served in the above-referenced action will timely move to dismiss your complaint, which appears to assert claims under Section 14 of the Securities Exchange Act of 1934. Accordingly, discovery and all other proceedings in the action are stayed until resolution of that motion. *See* 15 U.S.C. § 78u-4(b)(3)(B); *In re Smith Barney Transfer Agent Litig.*, 2006 WL 1738078, at *1 (S.D.N.Y. June 26, 2006). For that reason, your demand for immediate production of materials is premature.

Very truly yours,

Joseph N. Sacca

10

## Appendix 2:  Dates Plaintiff contacted Joe Sacca to set up ESI Conference

1. Monday October 11, 2010 1:08 pm
2. Wednesday, October 13, 1:24 pm
3. Thursday, October 14, 2:56 PM

(there may be more, but I don't have the current phone bill – even via online access—and my cellphone's past history only extended back 4 days.)

## Appendix 3: Emails to/from Joe Sacca by Plaintiff

This shows that Mr. Sacca did not meet (telephonically or in person, nor respeond within 1 day) to discuss discovery.

## Appendix #3a:

----- Original Message -----
From: "Peter Lindner" <nyc10003@nyc.rr.com>
To: "Sacca, Joseph N" <Joseph.Sacca@skadden.com>
Sent: Wednesday, October 13, 2010 7:40 PM
Subject: Re: Can we talk in a good faith conference?

A. Thanks for replying.

B. Comments below.

Regards, Pete Lindner...
Sent from my iPhone 917-207-4962

On Oct 13, 2010, at 4:57 PM, "Sacca, Joseph N" <Joseph.Sacca@skadden.com> wrote:

> Mr. Lindner,
>
> In response to your questions, it is in our view premature to discuss the format in which the parties might produce ESI in the event the case ever proceeds to the discovery stage.

Doesn't FRCP 26 require documents turned over before discovery?  And are you refusing to produce in ESI native format?  I expect an answer.

Also, did Amex stop me in 2007 from communicating with the SEC?  Read the record, counselor.


> With respect to your proposal that we agree to limit the length of the parties' submissions to the court, I can advise you that we will continue to comply with all applicable rules, which we believe impose appropriate limitations.
>
> Regards,
> Joe Sacca
>
-----Original Message-----
From: Peter Lindner [mailto:nyc10003@nyc.rr.com]

Sent: Wednesday, October 13, 2010 1:51 PM
To: Sacca, Joseph N (NYC)
Subject: Can we talk in a good faith conference?

Joe:

Re: your indication that you & Doug will handle the Amex Shareholder 2011 Annual
Meeting case

Please indicate this week if we can conference on FRCP 26, as I wrote/called you last week
and this.

Your secretary said you're not on vacation then or now, so at least say
You're busy but will get back to me on ___/___/2010
You set a time & date to talk
You refuse to conference on these issues

Regards, Pete Lindner...
Sent from my iPhone 917-207-4962


# Appendix #3b:


----- Original Message -----
**From:** Peter Lindner
**To:** Joseph Sacca
**Sent:** Wednesday, October 13, 2010 11:00 PM
**Subject:** Lindner v Amex, Chenault, Gupta,

Joe:

I was quite surprised when I read FRCP 26 and some other blogs to see that you are quite misleading by
writing tonight that we are too early to start ESI. In fact, the opposite is true: by bringing up the
information later, I'd lose the opportunity to get ESI and metadata in native format. Especially since the
metadata would help confirm if the info was tampered with.

I attach my letter on this subject to you, and hereby formally ask for a joint letter to The Court to get the
data within the next two weeks, since it should not take long for Amex to produce it. I hereby also refer to
Magistrate Judge Cott's comments on getting ESI after you have been served:    Case 1:10-cv-02228-
JSR-JLC Document 5 Filed 08/18/10 Page 3 of 3.


In the passage His Honor refers to

**"Local Civil Rule 37.3. Mode of Raising Discovery and Other Non-Dispositive Pretrial Disputes**

**With the Court (Eastern District Only)**

(a) **Premotion Conference.** Prior to seeking judicial resolution of a discovery or nondispositive pretrial dispute, the attorneys for the affected parties or non-party witness shall attempt to confer in good faith in person or by telephone in an effort to resolve the dispute. "

Since Judge Cott's ORDER is a week shy of two months old, and you have been on this case for a week, I find it hard to believe that your lack of cooperation on ESI is due to ignorance of this ORDER. I hope this will be the last of your non-cooperation in such matters. Discovery (ostensibly) is to both of our benefits; but in any case, it is the law.

I also attach an ORDER from SDNY Chief Judge Preska allowing me (as an indigent pro se litigant, approved as "in forma pauperis"*) to get experts, in case your data appears to have been tampered with by Qing and Jason, who admitted after 3-4 years that they breached the Amex Code and the Amex-Lindner June2000 Contract. It would be egregious if computer literate Qing had the opportunity to tamper with his PC and the Amex database/library during that time. Thus, the individual parties' data and PCs (etc) must be secured.

    Regards,
      Peter

Peter Lindner
1 Irving Place, #G-23-C
NYC, NY 10003
home: 212-979-9647
cell:   917-207-4962

*Case 1:10-cv-02228-JSR-JLC Document 1 Filed 03/15/10 Page 1 of 2

# Appendix #3c:

----- Original Message -----
From: "Peter Lindner" <nyc10003@nyc.rr.com>
To: "Joseph Sacca" <joseph.sacca@skadden.com>
Sent: Thursday, October 07, 2010 11:32 AM
Subject: Amex S/H 2011 Mtg Proposal by me & FRCP 26 native format

Joe:

I got your letter yesterday. Thanks.

Will you agree to abide by FRCP 26 on ESI, by giving all documents in native, SEARCHABLE format where available?

It will help in discovery.

Also, can we limit the size of the briefs and memos of law, which previously were several inches thick? I'd look forward to your thoughts on that.

Regards, Pete Lindner...
Sent from my iPhone 917-207-4962

## Appendix #3d:

----- Original Message -----
**From:** Sacca, Joseph N
**To:** 'Peter Lindner'
**Sent:** Friday, October 15, 2010 7:20 PM
**Subject:** Lindner v. American Express Company

Please see attached.

## Appendix 4:  8 page letter to Joe Sacca proposing ESI's scope

Wednesday, October 13, 2010 9:03 PM

Joe Sacca, Esq.
**Skadden, Arps, Slate, Meagher & Flom LLP**
Four Times Square
New York, New York 10036
Phone: 212.735.3000
Fax: 917-777-2358
F: 212.735.2000/1

Dear Joe:

I am asking early for the metadata of Amex's communications, emails, text messages, and personnel files (see Attachment 1 for verbiage on that) the metadata would ensure that the documents are authentic, time stamped and indicate routing information, and "the parties should discuss whether the production of metadata is appropriate and attempt to resolve the issue without court intervention."  I want you to agree to produce all documents that were electronic to be given in native format, and in a searchable ESI form; i.e. fax PDF's that are not searchable would be disallowed unless other copies have been destroyed.

You wrote me tonight at  Wednesday, October 13, 2010 4:57 PM "In response to your questions, it is in our view premature to discuss the format in which the parties might produce ESI in the event the case ever proceeds to the discovery stage."  This is in violation of FRCP 26, which is in Attachment 2, since I seek now the information that you "must, without awaiting a discovery request, provide to" me.  My iPhone reply to your email thus had to be more fleshed out when I returned home to check if you are trying to evade the law, by disregarding FRCP 26. If you wish, I hereby ask that we draft a joint statement now to The Court on our disagreement on this issue, so that the Judge can settle it.  Please indicate your position exactly, since I wish to **get** the data within two weeks, if possible, as opposed to your desire never to turn it over should we not "ever proceed to the discovery stage"—you wish.  I propose a conference after 5:30 pm weekdays, so that I can continue my normal job, which I started April 2010.

I am requesting that now, and in round 1 before we have the initial "Rule 16 Conference"[13], I seek:

---

[13] According to the ABA, as early as five years ago, they say these issues are settled in advance:

"I. Early Attention to Electronic Discovery Issues -- Rule 16(b), Rule 26(a), Rule 26(f) and Form 35

The Rule changes require parties to discuss electronic discovery issues early in a case as part of their initial Rule 26(f) conference. The agreements reached between counsel should be reported to the court at the initial Rule 16 Conference and reflected in the court's initial scheduling order. The subjects to be discussed include the form of production of electronically stored information (a definitional term adopted by the

1. Documents relating to all of CEO Ken Chenault's statements to/from me, including emails, drafts of replies, internal investigations, and contemplated answers. This includes practice tapes, videotapes, actual audio and video tapes of the shareholder (S/H) meetings.

2. Since CEO Chenault expressed his confidence in the people I named, and then Qing left 2 weeks later, it is appropriate to know if Qing left or was pushed out or was fired, and all ESI relevant or mentioning that, including issues of salaries and stock options should be included.

3. Since the issue of the Amex Code of Conduct was the essence of my April 2007 through 2010 S/H Proposals, any discussion between the General Counsel's Office, Jason Brown, his manager, Qing Lin, Ash Gupta, Secretary of the Corporation Stephen Norman, and Human Resources about possible violations and dates indicating who knew what and when, would be relevant to determine if Mr. Chenault was informed before or after Qing left, or not at all. And when did Ash learn of the alleged (now admitted) breach of the June 2000 Amex Lindner Contract signed by Ash.

4. Since I called Ash in July 2005 and his secretary set up a time for me to talk to Ash, and then security refused to let my phone call through, an account (including Lotus Notes, calendars, emails, text messages, phone logs, memos) of how the secretary characterized my call to Ash, and his purported reasons for avoiding the call, and also over the 4 year period, whether Ash or Qing ever discussed or emailed on this subject of the admitted breach of June 2000 Amex Lindner Contract.

5. Personnel records in electronic form, including affidavits of completeness, for all the above parties, so as to see if any of them were informed (as per the 2000 Amex Lindner Contract) and directed to not give any information to outside employers, and if Qing and Jason were reprimanded in any way for their admissions in January 2009 that they both breached the 2000 Amex Lindner Contract and the Amex Code.

6. ESI of the instructions given to Jason Brown in July/August 2005 and in Dec2005/Feb2006 by Mr. Norman or his subordinates on investigation my allegations about the alleged (now admitted) breach of the June 2000 Amex Lindner Contract and of the Code.

7. A statement from your keeper of documents that all such information is being retained, and not destroyed, and that the location of backup tapes/disks (etc) should be noted for any media that may be missing, including especially personnel files, which may have been tampered with, given that Qing and Jason had misled me and possibly Amex for 3 years.

8. That all data[14] shall conform to the stronger/strongest of the rules from SDNY, the Second Circuit Court of Appeals, NY State and the Sedona Conference. I hereby affirm

---

Advisory Committee, hereinafter "ESI"), the preservation of documents and whether the parties wish to reach any agreement regarding the assertion of privilege or work product protection for documents inadvertently produced or produced prior to a complete privilege review ("claw back" or "quick peak" arrangements)."
http://www.abanet.org/litigation/standards/docs/ediscovery_report.pdf
["Report Regarding Changes to Discovery Rules Regarding Electronic Discovery," circa June 16, 2005]
[14] The short version of FRCP 16 and 26 is: "1. ... EVERYONE must be prepared to discuss how and where they store their email early in the pretrial proceedings, they must preserve their email in a compliant manner and produce it with specified metadata intact, and they must produce their email quickly according to discovery timelines." And "4: Don't forget about instant messages and social media"

that this "case is reasonably likely to include electronic discovery". With regard to NY State, I refer to the document from SDNY/NY State document of Thursday, September 30, 2010 "Electronically Stored Information/ Harmonizing Practices in New York State and Federal Courts" which reads:

> "In August 2010, New York State amended the Uniform Rules for Trial Courts (22 NYCRR) § 202.12(b) to address the difficulties associated with ESI by adding the following provision: "Where a **case is reasonably likely to include electronic discovery**, counsel for all parties who appear at the preliminary conference must be sufficiently versed in matters relating to their clients' technological systems and to discuss competently all issues relating to electronic discovery; counsel may bring a client representative or outside expert to assist in such e-discovery discussions." See also Uniform Rules for Trial Courts (Rules of Practice for the Commercial Division) Rule 1(b)."" [**emphasis** added]

9. All email, notes, drafts that indicate whether you were privy to the fact that you wrongly informed the Court on 3 separate occasions that Amex did not stop me from communicating to the SEC prior to 2008, when in fact Ms. Park (your co-counsel from Kelley Drye) did in fact write and enforce such a document in April 2007, which prevented me from filing additional papers to the SEC. Those documents are needed to show that NY Judiciary §487 (a criminal misdemeanor, with treble damages to be awarded in a separate suit) applies that Amex/Sacca/Park did jointly or separately have "intent to deceive the Court or any of its parties," which applies to SDNY under Local Rule 1.5 which includes NY Judiciary §487 as this excerpt explains:

> "(5) In connection with activities in this court, any attorney is found to have engaged in conduct violative of the New York State Rules of Professional Conduct as adopted from time to time by the Appellate Divisions of the State of New York, and as interpreted and applied by the United States Supreme Court, the United States Court of Appeals for the Second Circuit, and this court." [page 6, or page 12 of 137, May 10, 2010 version]
> http://www.nysd.uscourts.gov/rules/rules.pdf

10. The name of Amex's keeper of documents and of Amex's ESI custodian/expert, with whom I shall be interacting. He should be prepared to give the library control system documentation, backup libraries, console data, and lists of previously found omissions of documents and estimates of their cost to recover and likelihood of being contaminated by parties unknown, given that allegedly Qing misled Jason in July 2005, and then Jason misled me in April 2006, which gave the parties 3 to 4 years to destroy documentation. Whatever controls have been implemented since these incidents were brought to light will be needed too.

All this data should be on CD's or DVD's, and we should draft a clawback provision in case you gave me a document in error. If there is more than 1 CD, the preferred media should be DVDs.

---

["Five tips for meeting the eDiscovery challenge," Date: September 30th, 2010, Author: Greg Arnette]
http://blogs.techrepublic.com.com/five-tips/?p=318

Also, I should like an explanation of the cost-benefit procedures used by Amex in investigating and settling an EEOC case, since the Code clearly provides a binary-like provision of expulsion or doing nothing. It needs to be seen how EEOC cases and contract cases are handled by Amex. We can start with all the emails that Qing (who now works for a competitor) got or sent that mentioned me (Peter W. Lindner, Lindner, Peter, etc.) or by an alias presumably to trick such approaches. You should also indicate which people were reprimanded or which people were not reprimanded for Jason's and Qing's breach of the contract, Code, and perhaps also of the law (Title VII of the Civil Rights Act of 1964, especially on retaliation). Qing's salary/compensation information should be included in some manner, so we can establish if a cost-benefit relation was established between upholding the law and the June 2000 Amex Lindner Contract versus having Qing work at Amex for an additional 4 years.

A summary report should be made of all EEOC queries / controversies / lawsuits / settled suits made by Amex over the past 15 years, and a summary report should be made of each document specifically that has ATTORNEY CLIENT privilege on it, with enough identifying information so that it is easily identifiable, and through which a claim of privilege can be decided upon (or removed from the 'privileged' category and thus given to me). Or, preferably, you can give me the raw documents, and I will adhere to "clawback."

        Sincerely yours,

               Peter W. Lindner
               1 Irving Place, #G-23-C
               NYC, NY 10003
               home/fax: 212-979-9647
               cell:     917-207-4962
               email:    nyc10003@nyc.rr.com

# Attachment 1: <u>Case Blurb: Aguilar; Metadata Production Requests Should be Made Early</u>

Posted by <u>rjbiii</u> on December 18, 2008

There is a clear pattern in the case law concerning motions to compel the production of metadata. Courts generally have ordered the production of metadata when it is sought in the initial document request and the producing party has not yet produced the documents in any form. On the other hand, if metadata is not sought in the initial document request, and particularly if the producing party already has produced the documents in another form, courts tend to deny later requests, often concluding that the metadata is not relevant.

In sum, as a recent article has noted, if a party wants metadata, it should "Ask for it. Up front. Otherwise, if [the party] ask[s] too late or ha[s] already received the document in another form, [it] may be out of luck." *Hagenbuch* [*v. 3B6 Sistemi Elettronici Industriali S.R.L.*, 2006 U.S. Dist. LEXIS 10838 (N.D. Ill. Mar. 8, 2006)] illustrates the wisdom of this advice. In that patent infringement suit, the plaintiff demanded electronic document production in native form in his first document request. The defendants rejected this request and produced the documents in TIFF format without metadata. The court noted that the TIFF documents did not contain such relevant information as the creation and modification dates of documents, email attachments and recipients, and other metadata. The court also observed that the metadata was relevant to the plaintiff's infringement claim because it "will allow him to piece together the chronology of events and figure out, among other things, who received what information and when." The court therefore ordered production in native form despite the fact that the defendants could not Bates stamp the documents and had already made a production.

By comparison, in [*Autotech Techs. Ltd. P'ship v. AutomationDirect.com*, Inc., 248 F.R.D. 556 (N.D. Ill. 2008)], the court denied a motion to compel the production of metadata for Word documents after the plaintiff had already produced the documents in both PDF and paper format. In that case, the initial production request did not specify a form for production. As the court noted, the plaintiff therefore could have produced its documents in the form in which they were ordinarily maintained or in a reasonably usable form. In concluding that production in PDF form constituted a reasonably usable form, the court relied heavily upon the defendant's failure to ask for metadata at the outset. The court stated that it "seems a little late to ask for metadata after documents responsive to a request have been produced in both paper and electronic format." . The court also noted that, "[o]rdinarily, courts will not compel the production of metadata when a party did not make that a part of its request." It concluded that the defendant "was the master of its production requests; it must be satisfied with what it asked for."
[...]
The Federal Rules of Civil Procedure, case law, and the Sedona Principles all further emphasize that electronic discovery should be a party-driven process. Indeed, Rule 26(f) requires that the parties meet and confer to develop a discovery plan. That discovery plan must discuss "any issues about disclosure or discovery of [EST], including the form or forms in which it should be produced." In fact, the commentary to the rule specifically notes that whether metadata "should

be produced may be among the topics discussed in the Rule 26(f) conference." As the commentary further observes, early identification of disputes over the forms production may help avoid the expense and delay of searches or productions using inappropriate forms." Thus, at the outset of any litigation, the parties should discuss whether the production of metadata is appropriate and attempt to resolve the issue without court intervention.

Likewise, courts have emphasized the need for the parties to confer and reach agreements regarding the form of electronic document production before seeking to involve the court. [...]

Metadata has become "the new black," with parties increasingly seeking its production in every case, regardless of size or complexity. In keeping with that trend, the Plaintiffs in this case argue that all metadata for all electronic documents should be produced, both because the metadata is relevant to their claims and because it will enable them to search and sort the documents more efficiently. In evaluating these assertions, the timing of the Plaintiffs' request is important. The first Rule 26(f) conference was held on January 18, 2008. Thereafter, the first request for production of documents was made on February 15, 2008. Throughout this time period, the Plaintiffs made no mention of metadata even though the Defendants had started to harvest their documents. Indeed, by the time the Plaintiffs first informed the Defendants of their desire for metadata (in passing on March 18 and formally on May 22, 2008), the Defendants' document collection efforts were largely complete and they had already produced many of their electronic documents in PDF format without accompanying metadata. In these circumstances, the Plaintiffs face an uphill battle in their efforts to compel the Defendants to make a second production of their ESI.

*Aguilar v. Immigration & Customs Enforcement Div.*, 2008 U.S. Dist. LEXIS 97018 (S.D.N.Y. Nov. 20, 2008) (internal citations removed).

Posted in 2nd Circuit, Case Blurbs, Discovery Requests, FRCP 26(f), Magistrate Judge Frank Maas, Meet and Confer, Metadata, S.D.N.Y | Tagged: Sedona Conference | Leave a Comment »

http://postprocess.wordpress.com/category/frcp-26f/

# Attachment 2:  The beginning of FRCP 26:

I seek now the information that you "must, without awaiting a discovery request, provide to" me.

"Rule 26. **Duty to Disclose; General Provisions Governing Discovery**

(a) Required Disclosures.

**(1) Initial Disclosures.**

(A) *In General*. Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:

(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information — along with the subjects of that information — that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

(ii) a copy — or a description by category and location — of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;

(iii) a computation of each category of damages claimed by the disclosing party — who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered; and

(iv) for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment."

# Attachment 3:  Letter of Joe Sacca to Peter Lindner on Wednesday, October 13, 2010 4:57 PM

"From: "Peter Lindner" <nyc10003@nyc.rr.com>
To: "Sacca, Joseph N" <Joseph.Sacca@skadden.com>
Sent: Wednesday, October 13, 2010 7:40 PM
Subject: Re: Can we talk in a good faith conference?

A. Thanks for replying.

B. Comments below.

Regards, Pete Lindner...
Sent from my iPhone 917-207-4962

On Oct 13, 2010, at 4:57 PM, "Sacca, Joseph N" <Joseph.Sacca@skadden.com> wrote:

> Mr. Lindner,
>
> In response to your questions, it is in our view premature to discuss the format in which the parties might produce ESI in the event the case ever proceeds to the discovery stage.

Doesn't FRCP 26 require documents turned over before discovery?  And are you refusing to produce in ESI native format?  I expect an answer.

Also, did Amex stop me in 2007 from communicating with the SEC?  Read the record, counselor.

> With respect to your proposal that we agree to limit the length of the parties' submissions to the court, I can advise you that we will continue to comply with all applicable rules, which we believe impose appropriate limitations.
>
> Regards,
> Joe Sacca
>
> ----- Original Message -----
From: "Sacca, Joseph N" <Joseph.Sacca@skadden.com>
To: "'Peter Lindner'" <nyc10003@nyc.rr.com>
Sent: Wednesday, October 13, 2010 4:57 PM
Subject: RE: Can we talk in a good faith conference?

Mr. Lindner,

In response to your questions, it is in our view premature to discuss the format in which the

parties might produce ESI in the event the case ever proceeds to the discovery stage.  With respect to your proposal that we agree to limit the length of the parties' submissions to the court, I can advise you that we will continue to comply with all applicable rules, which we believe impose appropriate limitations.

Regards,
Joe Sacca

-----Original Message-----
From: Peter Lindner [mailto:nyc10003@nyc.rr.com]
Sent: Wednesday, October 13, 2010 1:51 PM
To: Sacca, Joseph N (NYC)
Subject: Can we talk in a good faith conference?

Joe:

Re: your indication that you & Doug will handle the Amex Shareholder 2011 Annual Meeting case

Please indicate this week if we can conference on FRCP 26, as I wrote/called you last week and this.

Your secretary said you're not on vacation then or now, so at least say A. You're busy but will get back to me on ___/___/2010 B. You set a time & date to talk C. You refuse to conference on these issues

Regards, Pete Lindner...
Sent from my iPhone 917-207-4962"

# Appendix 5: SDNY rules / guidelines for EEOC related suits

Here's what SDNY writes on EEOC related suits:

"DEFINITIONS and INSTRUCTIONS
1. The provisions of Local Rules 26.2, 26.3, 33.1, 33.3 relating to claims of privilege, uniform definitions, references to records, and interrogatories apply to and are incorporated by reference.

2. "Personnel records" refers to any document or electronically stored information ("ESI") in any form whatsoever in the possession, custody or control of the defendant that is used, has been used, or may be used relative to plaintiff's qualifications for employment, promotion, transfer, compensation or disciplinary action. Personnel records also include any document or ESI in any form whatsoever in the possession, custody or control of a person, corporation, partnership or other entity that keeps or supplies a personnel record for the defendant. Without limiting the foregoing, all of the following documents and/or ESI constitute part of the personnel records:

      (a) plaintiff's job application
      (b) plaintiff's resume or other form of employment inquiry to defendant
      (c) defendant's offer of employment, promotion or transfer
      (d) plaintiff's performance evaluations
      (e) documents or ESI concerning any disciplinary action taken against plaintiff
      (f) awards or other documents or ESI concerning commendations for plaintiff
      (g) waivers or other written agreements between defendant and plaintiff
      (h) termination notices and letters of rejection.

3. Documents produced shall be Bates-stamped or otherwise numbered sequentially.

4. The answers to these interrogatories shall be promptly supplemented and amended as required by Rule 26(e) of the Federal Rules of Civil Procedure. 5. In the event that an answer to any interrogatory is made by reference to records from which the answer may be derived or ascertained, as permitted by Rule 33(d) of the Federal Rules of Civil Procedure, provide the information required by Local Rule 33.1 and make the documents or ESI referred to available for inspection and copying within fourteen (14) days after the service of answers to these interrogatories as required by Local Rule 33.1(d).

DOCUMENT REQUESTS AND INTERROGATORIES

1. Produce the "personnel records" concerning the plaintiff as defined above.

2. Identify plaintiff's job title and description, as well as the starting date and termination date of plaintiff's employment.

3. Identify plaintiff's compensation, including the amount of plaintiff's base salary and /or rate of pay and a description of all fringe benefits plaintiff receives or received as an employee of the defendant.

4. Identify the legitimate non-discriminatory reason(s) the defendant claims motivated the adverse action(s) taken against plaintiff that is/are the subject of plaintiff's complaint and produce all supporting documents, reports, memos, evaluations and ESI.

Dated: _____, _____
             *(town/city)*  *(state)*

_____ ___, 20__

_____
*Signature*

_____
*Address*

_____
*City, State*

_____
*Zip Code*

_____
*Telephone Number*

_____
*Fax Number (if you have one)*

<u>Plaintiff's Interrogatories & Request for Production of Documents - Employment Discrimination Cases</u>

## Appendix 6: Joe Sacca and Jean Park's comments on Amex not stopping Lindner from communicating with SEC

## Appendix 6A:  Joe Sacca says Lindner claims MJ Katz enjoined Lindner from contacting SEC

**E.    Mr. Lindner Commences this Action**

On March 15, 2010, Mr. Lindner commenced this action.  In his complaint, he concedes that his Proposal was untimely (Compl. ¶ 18), and incorrectly asserts that American Express excluded the Proposal from its proxy materials pursuant to Rule 14a-8(i)(7) as a matter relating to the company's ordinary business operations  (*id.* ¶ 16).[7]  Mr. Lindner also appears to allege that certain orders issued by Magistrate Judge Katz in Mr. Lindner's earlier-filed and still pending lawsuit against American Express somehow hampered him from providing the SEC with information he believes would have led the SEC to conclude that the proposal he submitted for inclusion in American Express' proxy materials for its Annual Meeting held in 2009 – not the Proposal that is the subject of his present complaint – was not properly excludable.  (*Id.* ¶ 10.)

[pages 9-10, Memorandum of Law in Opposition.pdf, March 23, 2010]

I also can include an 11 page document of Tuesday, March 16, 2010 5:47:40 PM where I call upon Joe Sacca to admit that Amex's counsel had intent to deceive the Court by saying / writing that it Amex did not try to stop me from communicating with the SEC?  This I call the "weasel" document, since it begins: "Are you weaseling out of this, just like you wanted to hang up when I say that Amex deceived the Court?"

## Appendix 6B:  Jason Brown in April 2007 reads into the Court Transcript enjoining Lindner from contacting SEC

Here's the transcript excerpt that shows Amex did stop Plaintiff from communicating with the SEC, which remained in effect to stop Plaintiff from filing the Shareholder Proposal on fixing

the Amex Code of Conduct and from running for the Board of Directors in April 2007: "That Mr. Lindner, acting alone or in concert, directly or indirectly, will not submit any shareholder proposal under Rule 14(a)(8) under the Securities and Exchange Act of 1934, or any other rule under that Act, as amended, or any successor rule;"

Here's the confidential transcript where on pages 3-4, Jason Brown, Esq. VP of Amex reads into the (sealed) record that stopped me from communicating with the SEC: " That Mr. Lindner, acting alone or in concert, directly or indirectly, will not submit any shareholder proposal under Rule 14(a)(8) under the Securities and Exchange Act of 1934, or any other rule under that Act, as amended, or any successor rule;"

"MR. BROWN: And I'll read this. This is Jason Brown,

counsel for American Express.

That Mr. Lindner, acting alone or in concert, directly

or indirectly, will not submit any shareholder proposal under

Rule 14(a)(8) under the Securities and Exchange Act of 1934, or

any other rule under that Act, as amended, or any successor

rule;

He will not under American Express Company's bylaws

nominate himself or anyone else to run for board of directors;

That he cannot bring any item for action before any

meeting of shareholders of American Express Company;

He cannot attend any shareholders meetings;

He cannot engage in any solicitation of proxies under

any regulation or rule of the Securities Exchange Act of 1934

in opposition to the company's own proxy solicitation;

He cannot request a shareholder list under any

Securities laws, being federal laws or state laws;

He must remove his website regarding his proxies or

any, I guess, shareholder activity and will not in the future

post any such website.

MS. PARK: Or engage in any disparagement of the

company, including disparaging blogs on the internet, in

exchange for which we would agree to provide Mr. Lindner"

[TR 3, line 25 to TR 4, line 22, Still CONFIDENTIAL TRANSCRIPT OF SETTLEMENT CONFERENCE
LindnervAmEx032907.pdf, Thursday, March 29, 2007]

# Appendix 6C: Excerpt from April14 2009 Transcript in front of SDNY USDJ Koeltl

In this first excerpt (of two discrete courtroom events, separated by more than 1 week), Ms. Park
says that Amex has not "in any way restrained, obstructed, or in any way attempted to delay or
frustrate Mr. Lindner's shareholder activities." This is despite the fact that Ms. Park did attempt
(and succeeded) in stopping my (Plaintiff Lindner's) attendance at the April 2007 Amex Annual
Shareholder Meeting, and also attempted (but did **not** succeed upon) a prior restraint on (Plaintiff
Lindner's) free speech at the Amex April 2009 Annual Meeting.
Transcript 94E4LINC April 14, 2009, 10:14 a.m.
"16 [MS. PARK:] I want to make clear, your Honor, that at no juncture
17 has the company in any way restrained, obstructed, or in any
18 way attempted to delay or frustrate Mr. Lindner's shareholder
19 activities. The only thing we have sought, your Honor, from
20 the inception of this litigation going back to I believe, your
21 Honor, as early as November 21, 2006, when we were before your
22 Honor for oral argument on the company's 12(b) motion, was to
23 restrain Mr. Lindner from discussing directly with anyone from
24 the company his claims in connection with this litigation and
25 the company's defenses."
[Tr 5, lines 16-25]
Ms. Park in her email of Monday, March 16, 2009 5:33 PM which contained this attempted
restraint of me (Plaintiff Lindner) where Ms. Park is "simply asking that he be barred from
discussing matters." Presumably, to Ms. Park, a prior restraint of speech is not an example of
how the"company in any way restrained … Mr. Lindner's shareholder activities." I believe Ms.
Park is intending to deceive USDJ Koeltl, since clearly Ms. Park is asking Your Honor, MJ Katz
for an Order which would restrain my speech at the April 27, 2009 meeting subject to Contempt
of Court.
["L to Katz re sanctions and reconsideration.pdf", page 2 of 4]
6
The letter continues with what may be an additional (and then again failed) attempt to restrain
me from attending the April 2007 meeting in North Carolina by having me pay for Ms. Park's
travel there. I am reminded of the phrase: "the power to tax, is the power to destroy". In this
case, Ms. Park seeks additional financial levies upon me (Plaintiff Lindner) to "obstruct" and
"frustrate" my attendance at a meeting which SEC regulations force me to go to in order to be
able to present the same proposal in the next two years. Here's how Ms. Park ends her March

16, 2009 motion to Your Honor:
["L to Katz re sanctions and reconsideration.pdf", page 2 of 4]


# Appendix 6D : Excerpt from Transcript in front of SDNY USDJ Koeltl


Source:   Transcript 94n3linc April 23, 2009, 6:30 p.m.

In this excerpt (among others), Mr. Lindner (Plaintiff)  states that "AmEx got a court order to stop me from communicating with the SEC" [Tr 2 line 14 – Tr 3 line 15].

I (Plaintiff Lindner) continue by saying:

" 10 [MR. LINDNER:]… So I was quite surprised to
11 see in his brief that Ms. Park said that American Express never
12 tried to stop me from communicating with the Securities and
13 Exchange Commission. I don't know why they keep saying that."
This is followed by Joe Sacca's continued insistence that in fact Amex did not stop me (Plaintiff Peter Lindner) from communicating with the SEC:
" 9 MR. SACCA: Good afternoon, your Honor. I will be
10 very brief. I don't intend to repeat anything that was in our
11 papers, unless your Honor would like clarification.
12 I would like to address just a couple points. One is
13 the accusation that we've made misrepresentations to the Court
14 about Mr. Lindner's ability to communicate with the SEC. There
15 is in fact no evidence in the record that Mr. Lindner was under
16 any prohibition from responding to the SEC in response to
7
17 American Express' request for no action. "


The context is below, but is merely illustrative. The record is more full than this.


14 MR. LINDNER: Thank you, your Honor. I appreciate
15 that you've read everything. I guess the question is what
16 constitutes irreparable damage when this same thing keeps
17 happening year after year. I had hoped in 2006 when I attended
18 the shareholders meeting that my words to Ketchen Oltin [Ken Chenault] in the
19 question and answer period, how seriously does American Express
20 take its code of conduct, and he replied very, very seriously.
21 So, I thought that might be a type of wake-up call for the

22 people under him so that they would use the code of conduct,
23 which actually would have settled my whole problem with a memo
24 and a phone call. Although -- and exchange of money, too, for
25 violation of a contract. That did not happen.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
3
94n3linc Motion
1 And when I wanted to go to the shareholders meeting in
2 2007, again this time I filed on the SEC Web site, AmEx got a
3 court order to stop me from communicating with the SEC, to ask
4 me to withdraw my filing from the SEC, to take down my Web
5 site, to not attend the shareholders meeting, to not ask my
6 questions.
7 And what's more amazing is that in the last week's
8 April 14 meeting in front of your Honor, Joe Sacca said AmEx
9 has never tried to stop communication with the SEC. I stood up
10 and corrected his misimpression. So I was quite surprised to
11 see in his brief that Ms. Park said that American Express never
12 tried to stop me from communicating with the Securities and
13 Exchange Commission. I don't know why they keep saying that.
14 And in fact it's even in their own exhibit where they quote
15 from my filing with the SEC. […]
[…]
10
94n3linc Motion
1 [MR. LINDNER] […] But what I think is worse is for
2 AmEx to act in bad faith to the SEC, which is, given all the
3 financial difficulties this country has had recently, we need
4 somebody like the SEC to be strong, and people should respect
5 its integrity and the integrity of the system.
6 THE COURT: Thank you, Mr. Lindner.
7 MR. LINDNER: Thank you, sir.
8 THE COURT: Defendants.
9 MR. SACCA: Good afternoon, your Honor. I will be
8
10 very brief. I don't intend to repeat anything that was in our
11 papers, unless your Honor would like clarification.
12 I would like to address just a couple points. One is
13 the accusation that we've made misrepresentations to the Court
14 about Mr. Lindner's ability to communicate with the SEC. There
15 is in fact no evidence in the record that Mr. Lindner was under
16 any prohibition from responding to the SEC in response to
17 American Express' request for no action. In fact, although
18 Mr. Lindner has asserted that it wasn't until March 23 of this
19 year that Magistrate Judge Katz freed him to respond to the

20 SEC, we have put into the record as Exhibit 9 to my declaration
21 a letter to Mr. Lindner from the chief counsel of the SEC dated
22 April 8, 2009, in which he says he is responding to four
23 letters from Mr. Lindner, one of which was dated February 25 of
24 2009. So we do have evidence that Mr. Lindner was
25 communicating with the SEC during a period he now says we were
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

94n3linc Motion
1 prohibiting him from doing so. I did just want to respond to
2 that accusation briefly.
3 The last point I'd like to make is in reference to
4 Mr. Lindner's -- what he says are recent conversations with
5 Mr. Be of the SEC staff. […]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

PETER LINDNER,

                                    Plaintiff,                    AFFIRMATION OF SERVICE

            -against-

AMERICAN EXPRESS COMPANY, CEO KEN
CHENAULT,  BANKING PRESIDENT ASH GUPTA,
(FORMER) SECRETARY OF THE CORPORATION
STEPHEN NORMAN  AND  GENERAL COUNSEL
LOUISE M. PARENT,

                                    Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Date:  Thursday, October 21, 2010

I, Peter W. Lindner, declare under penalty of perjury that I have served a copy of the "Request
For ESI From Adversary" upon The Pro Se Office and via email to Joe Sacca of Skadden, whose
addresses are:

Joe Sacca, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP              Pro Se Office
Four Times Square                                     US District Court SDNY
New York, New York 10036                              United States Courthouse
Phone: 212.735.3000                                   500 Pearl Street
Fax: 917-777-2358                                     New York, New York 10007-1312
F: 212.735.2000/1                                     Pro Se Office phone:  212-805-0175
Joseph.Sacca@skadden.com

by email, fax, in person (and/or USPS).

I also faxed the first 9 pages to His Honor Magistrate Judge Cott.

By: _____          Dated: October 21, 2010
        Peter W. Lindner                      New York, NY
        (Peter Lindner)
        Plaintiff, *Pro Se*
1 Irving Place, Apt. G-23-C
New York, New York 10003
Home/ Fax:    212-979-9647
Cell:              917-207-4962

> To the Pro Se Office:
> Please time stamp the
> extra original and send it
> back to me.
> Thanks,  Peter Lindner